THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HARRY BROOKS, Defendant-Appellant.

(No. 56443;

First District—August 14, 1972.

768

Melvin S. Cahan, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Terence J. Mahoney, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After trial by jury, Harry Brooks (defendant) was found guilty of the murder of his mother. The court sentenced him to the penitentiary for 100 years to 175 years.

Defendant appeals, contending: (1) that the trial court erred in denying his motion to suppress physical evidence; (2) that the evidence failed to prove him guilty beyond a reasonable doubt; (3) that the trial court failed to instruct the jury adequately regarding circumstantial evidence; (4) that he was denied a fair trial by virtue of an occurrence in the presence of the jury; and (5) that the court erred in receiving certain demonstrative evidence. We will first state the pertinent facts and then consider these contentions in order.

We will first identify certain of the witnesses and participants and we will then state a summary of their testimony in chronological manner. For some seventeen years prior to this occurrence, defendant and his mother had lived together in her apartment on the second floor rear of a building on West Lake Street in Chicago. At the time of her death, the mother was about 75 years of age. At that time, defendant was approximately 54 years old. The deceased had known a woman named Clara Brabec on a fairly intimate basis for from 25 to 30 years. They generally had Christmas dinner together. Another person friendly with the deceased was Alice Brooks who was married to defendant but separated

from him. Defendant at that time was friendly with a woman named Ann Carlson and they were contemplating marriage.

The evidence also shows that it was customary for the deceased to have fairly large sums of currency in her possession. She kept this money pinned to her garter belt in a long envelope. The deceased also had a number of pieces of costume jewelry including a pin which had been given to her by Clara Brabec. She also owned three fairly valuable rings. Two of these rings were diamonds which deceased kept pinned to her girdle. The third ring was an oval shaped purple ring which she wore constantly on her hand. Defendant and his mother were the only persons who had keys to the apartment. From this point on, we will state the various facts in chronological order.

On Friday, December 20, 1968, Alice Brooks spoke to the deceased on the telephone and they made arrangements to meet for Christmas dinner at 1:00 P.M. On the same day, during the morning, Clara Brabec went to the apartment. She noted that the window drapes were drawn shut. At 2:15 P.M. she went there again to visit the deceased and apparently found no one home. She found the back door locked and there was no answer to her knock. She called on the telephone several times during the day and received no answer.

On Saturday, December 21, 1968, Clara Brabec again called the apartment and received no answer. On that same day, defendant met with Ann Carlson. Prior to that time he had borrowed small sums from Mrs. Carlson in the neighborhood of $10 or $20. He then owed her $125. On that date, he produced a large roll of bills in $20 and $50 denominations and gave her $200. In addition, at the same time, he gave her the three valuable rings owned by his mother, including the oval ring which had constantly been on her finger, and the two diamonds which she had kept pinned to her girdle.

On Sunday, December 22, 1968, Alice Brooks attempted to call the deceased several times during the day and until 10:00 P.M. She did not receive any answer. Clara Brabec called two or three times on the telephone on that same day and received no answer. On that day, defendant had another conversation with Ann Carlson in which he told her that his mother had gone to Arizona. At that time, defendant had a key to Ann Carlson's home and he testified that he stayed at her apartment for several nights during this particular time. On Monday, December 23, 1968, both Alice Brooks and Clara Brabec again attempted unsuccessfully to reach the deceased on the telephone.

On Tuesday, December 24, 1968, Mrs. Ernest Schmidt, wife of the building janitor, went upstairs to the front door of the apartment during

the evening hours. She knocked and received no answer. She did not try to open the door to ascertain if it was locked. She saw no sign of damage to the front door or of forcible entry. She had a Christmas present for deceased in a gift wrapped box. She left this package in the hall in front of the door. Two other gift wrapped packages were already there. On that same day, Clara Brabec called the apartment on the telephone and received no answer. She also rang the front bell but received no answer. As we will note later, defendant testified that on this day he found his mother's dead body in the apartment. On Christmas Day, and on the next day, Clara Brabec again failed to reach deceased by telephone. In addition, Alice Brooks called deceased and received no answer.

On December 27, 1968, Clara Brabec called deceased several times from work and received no answer. At about 2:30 in the afternoon, she visited the apartment and knocked at the door but received no answer. She went around to the rear door and found that door ajar but held in place by the inside chain. She then spoke to Ernest Schmidt, the janitor, and also to Edward Williams, the owner of the building. She then went to a tavern one block away from the apartment. She saw defendant sitting at the bar with his head down. She inquired about his mother and he said that his mother had gone to Arizona. Mrs. Brabec replied that the mother had never told her about this trip and she asked defendant if she could have his keys to the apartment. Defendant made no response. He stood up and she inserted her hand into his coat pocket and removed the mother's costume jewelry wrapped in a handkerchief. She asked defendant if he was robbing his mother. There was no response but defendant left and she followed. She again asked for the keys and defendant refused. He also said that his mother had left the apartment early on December 23 and that he did not know where she was. Mrs. Brabec threatened to call the police and said to defendant, "I think something has happened to your mother." Defendant did not respond. In the opinion of Mrs. Brabec, he was not intoxicated at that time and place. Mrs. Brabec also rang the bell to the apartment on that same day, about 8 or 8:30 P.M., and there was no response.

Ernest Schmidt, the building janitor, also testified that, after his conversation with Clara Brabec, he went up to the apartment. He found the front door closed. He did not try the door handle. He had no pass key and tried unsuccessfully to insert other keys in his possession. There were no signs of forcible entry at the front or back of the apartment. There were no gift wrapped packages at the front door. He found no odor in the hallway. He went to the same tavern where he found defendant, who had been drinking. Defendant told him that his mother

had gone to Arizona. On the same day, defendant left Ann Carlson's apartment and took with him the money that he had previously given her, as well as the three rings.

On Saturday morning, December 28, 1968, at 8:30 A.M., Ernest Schmidt, the building janitor, returned to the apartment. He noticed an unusual odor in the hallway and he asked the building owner to call the police. This was done and two officers responded to the call. When they were halfway up the stairs, they noticed a strong and unusual odor from the second floor. They identified this odor as being associated with the presence of a dead body. They found the front door unlocked. It opened upon turning the handle and they entered. The officers testified that they found nothing to indicate forcible entry. As they entered the apartment, the odor became stronger. As they entered the living room, they saw a huge pile of clothing, blankets, shirts and papers on the couch with the feet of a woman protruding from one end. Photographs received in evidence depicted this scene with Christmas wrapping and Christmas boxes on top of the stack of clothing over the body. Several Christmas gifts had been unwrapped. On a small table in front of the couch, the police found an open but empty bottle of cologne. A slight odor of cologne came from the top of the heap. Then then called their supervisor and the Crime Laboratory.

While waiting, they inspected the bathroom and found a blood stained rug in the bathtub. There was an odor from the rug similar to that in the apartment. The rug was stained with a substance later determined to be blood. They also entered the open bedroom and found a man's shirt. Stains on this article were subsequently found to be blood. They noted that the drapes in the front, or living room where the couch was located, were pinned together with three or four clothespins in each drape.

The objects upon the body were then removed and the corpse exposed. The deceased was facing toward the back of the couch; her clothing had been pulled up close to her head and her undergarments had been pulled down toward her knees. She was wearing a girdle at that time. Competent pathological evidence established without contradiction that death occurred from seven to ten days before December 29, 1968, which would be any time from December 19 up to December 22. Death resulted from two stab wounds in the neck. There was no evidence of sexual molestation. There was one bruise below the chin and another in back of the neck. The stab wounds were in the front portion of the neck. There were no other signs of violence.

While the police were in the apartment, Ann Carlson called and the police answered. They told her that defendant was wanted in connection with the death of his mother. Clara Brabec called at or about that time

and the police told her of the mother's death. On that same day, defendant met a man named Louis Tazelaar at a liquor store. They had known each other for about a month or six weeks. Apparently indulgence in alcohol was their common interest. They had a number of drinks and defendant went home with Tazelaar. Defendant stayed at Tazelaar's home for a week. During all of that time they drank rather heavily and defendant always gave Tazelaar the required money for the purchase of liquor. Defendant never went out of the home but all purchases were made by Tazelaar. Ann Carlson also joined defendant at Tazelaar's home, together with the latter's daughter and at times her fiance.

On Monday evening, December 30, 1968, defendant called Clara Brabec and asked her where his mother's body was. Defendant asked if she knew in which cemetery the mother would be buried. Mrs. Brabec at that point became hysterical and asked defendant how he could do this. Defendant made no denial of his guilt but told Mrs. Brabec that he was going to commit suicide. She said, "I hope that the police catch you before and make you view your mother's body." Defendant then hung up. On this same day, some 30 minutes later, defendant picked up Ann Carlson in his car and drove her out to Berwyn where they stayed at the Tazelaar home together.

There is also direct evidence concerning admissions by defendant. Ann Carlson testified that she told defendant what had happened to his mother and that the police were searching for him. This was while they were going to the Tazelaar home in Berwyn. Defendant told her that he would not tell her anything. He warned her not to say anything. Shortly thereafter she told defendant to go to the police but he said that he wanted to see his lawyer first. She told defendant several times to go to the police but he replied that he was too nervous. Defendant then refused to tell her what had transpired. She asked him if he had seen his mother and he replied, "Not at first." Shortly before Mrs. Carlson left the home in Berwyn, she spoke to defendant about his mother while they were in the kitchen together. Defendant told her not to mention his mother in front of the others in the house.

Louis Tazelaar testified that he heard Ann Carlson having a discussion with defendant in the kitchen before she left. Later he asked defendant what was bothering him. Defendant said that he was worried about his mother and that he thought she was dead. Defendant then said to Tazelaar, "I killed her." Both defendant and Tazelaar were drinking at that time. On cross-examination Tazelaar stated that defendant said, "I think she is dead, I think I killed her."

Tazelaar's daughter, Roberta, was present in the home at or about that time. She testified that defendant and Ann Carlson had a conversa-

tion in the kitchen of the home in which Mrs. Carlson was asking defendant if he wouldn't give himself up. She also testified that she then heard her father and defendant in a conversation in which defendant said, "I think I killed my mother." On cross-examination she stated that she could not hear all of the words clearly.

Defendant testified in his own behalf. He stated that his mother gave him her three rings during the month of November, 1968. He then showed these rings to Ann Carlson and told her that he was going to make her an engagement ring out of one. He also testified that sometime between December 20, 1968, and January 4, 1969, he had possession of a large roll of money. He obtained this by collecting a gambling debt. He would lie to Ann Carlson by telling her he was working but his main occupation was gambling. His mother had loaned him money on quite a few occasions and had covered bad checks for him. She had never refused to help him. He denied that he had killed his mother and testified that he told Tazelaar only, "They think I killed her."

He testified that early on Tuesday morning, December 24, 1968, he entered the apartment about 6:30 or 7:00 o'clock and spoke to his mother. He told her that he was going out to buy a Christmas tree. He did so and took the tree to Mrs. Carlson's home. That afternoon he spent some time in the tavern and then went back home to dress. He noticed that the drapes on the back window were closed. He looked into the living room and saw something covered on the couch. He lifted the cover and saw his mother's body. He saw the blood stained bathroom rug in the living room. He had several drinks and then threw the rug into the bathtub and turned on the shower. He also tried to wipe up the blood in the front room. However, he felt himself becoming sick and he left the apartment without calling the police.

He called Clara Brabec the following Monday, which would be December 30, 1968, and told her to make sure that his mother was buried in the family plot. He stated that he had denied his guilt to Clara Brabec. He testified that he did not see his mother's face and did not notice that she was stabbed. He saw blood along side of her but did not feel her pulse to determine if she was alive. He admitted that he lied when he told Ann Carlson, Clara Brabec and Mr. Schmidt that his mother had gone to Arizona. He also admitted that he had lied on direct examination when he testified that he told Ann Carlson that he obtained his money from working. He actually told her that he got the money from the vault. He never saw his mother take money from her garter belt or corset and did not know where she kept the money. He did not throw the Christmas wrappings on top of the body. He did not see the Christmas gifts outside the front door. When he entered the apartment that

afternoon, he unlocked the door and walked in. It was always necessary to put the key in to open the door. The back door was then wide open. He testified that his mother was alive and in good health from December 20 to and including December 23. He testified that he did not pour the cologne on his mother's body to suppress the odor.

Defendant's first contention is that the entry of police officers without a search warrant into the apartment occupied by the deceased and defendant and the subsequent seizure of physical evidence therein violated his rights under the Fourth Amendment to the United States Constitution. A motion to suppress physical evidence on this theory was made prior to trial and vigorously urged. The trial judge heard evidence from the defendant, the owner of the property, the janitor and a police officer. The court then announced findings of act and conclusions of law and denied the motion.

■■ Defendant's brief cites 33 decisions in support of his argument. Time and space prevent us from analyzing each of these authorities. We will merely state that we find none of them which requires us to disturb the ruling of the trial court. Generally speaking, defendant's basic theory is that entry and search of a private dwelling without a warrant is constitutionally prohibited except under circumstances where the police are actually confronted with an emergency which dictates a need for immediate action. Defendant urges that no such emergency in fact existed here so that it was the duty of the police to obtain a search warrant before entering the premises. Defendant seeks to criticize the trial judge because he held that entry by the police without a warrant was reasonable under the circumstances here. Defendant's argument is fallacious and not supported by the authorities. In our opinion, determination of legality of the entry here depends upon the circumstances which confronted the police as determined from their point of view. If the entirety of all of the circumstances known to the police reasonably convinced them that an emergency or exigent circumstances existed which required immediate action, then they acted properly in entering the private home. In other words, "breaking into a home by force is not illegal if it is reasonable in the circumstances." *Wayne v. United States,* 318 F.2d 205, 212, *cert.* denied 375 U.S. 860, 11 L.Ed.2d 86, 84 S.Ct. 125.

In the case at bar, the evidence showed that the deceased was missing from her home for an inordinate length of time under alarmingly suspicious circumstances. The evidence heard on the motion to suppress shows that the police were advised by the owner of the building that he had not seen the mother for a whole week but that she was usually in constant communication with him. He told the police that he was concerned about the "well-being and safety" of Mrs. Brooks and that

they should investigate. Defendant was not present when the police arrived and they were told that he had been seen about the back of the building during his mother's absence. The police also knew that a number of persons had tried repeatedly to communicate with the mother, without success. The janitor had previously noted an offensive odor similar to that associated with a dead animal.

When the officers entered the building, they too detected the odor. They knew that this strong and sickening stench generally came from a dead human body. When they came to the front door of the apartment, it opened upon turning the doorknob. The officers then discovered the corpse upon the couch. This, of course, required complete investigation. However, immediately prior to their entry, the police did not know what would confront them upon entry to the premises. The missing person may have been found severely injured under intolerable circumstances. The odor may have been caused by the rotting flesh of a living person after severe burns or other injuries. The very uncertainty created by the totality of all of these circumstances created a justification, and actually a need, for the police to take immediate action. As so well stated by Mr. Justice Burger in *Wayne v. United States*, 318 F.2d 205 at page 212:

> "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response."

*Patrick v. State*, 227 A.2d 486, is perhaps the closest authority of those presented to us. A body was discovered by the employer of the deceased. He immediately called the police and told them that the man had a head wound and might be dead. Acting upon that information, the police entered the dwelling, found the body and removed various physical evidence. This was done without a search warrant or consent. The court held that this entry was lawful. The test approved by the court was the reasonableness of the entry upon private property as measured by the circumstances then existing as disclosed to the police. The court held that, "The general rules governing searches and seizures are subject to the exception of emergency situations, sometimes called the 'exigency

rule'." (*Patrick v. State* (Supreme Court of Delaware, 1967), 227 A.2d 486, 489.) The court went on to say (227 A.2d 486, 489):

> "As a general rule, we think, an emergency may be said to exist, within the meaning of the "exigency" rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact."

It should be noted that the court in *Patrick* cited with approval the language and theory adopted by the Court of Appeals in *United States v. Barone*, 330 F.2d 543, cited and depended upon by defendant. The facts in *Barone* are different from the case at bar because there the officers entered a dwelling without a warrant after hearing loud screams emanating therefrom in the middle of the night. The court in *Barone*, however, specifically relied upon *Wayne*, which we have cited above, and applied the theory that the police had a right and a duty to act because of their reasonable belief that an emergency existed.

Another decision of importance here is *People v. Smith*, 47 Ill.2d 161, 265 N.E.2d 139. The facts are different in *Smith* than in the case at bar. There, answering a radio call, police officers found defendant lying on the landing in a small hotel. He did not respond to questions. There was no evidence of alcohol about him. Police searched his person and found marijuana. The court held that this was a reasonable and lawful search. The case is important because it specifically applied the "exigency rule" and concluded that the search was lawful upon the authority of *Patrick, Barone* and *Wayne* (*supra*).

■■ In the case at bar, the open front door presented a reasonable and speedy method of ascertaining precisely what were the facts which had created the reasonable apprehension of emergency. When the police entered, they observed the dead body which justified and required each and every step which they subsequently took. No search or prying into hidden places was required for the police to obtain the stained rug and shirt. These articles were in open view. (*People v. Howlett*, 1 Ill.App.3d 906, 911, 274 N.E.2d 885, citing *People v. Davis*, 33 Ill.2d 134, 138, 210 N.E.2d 530.) We conclude that the able trial judge reached the proper conclusion when he overruled the motion of defendant to suppress physical evidence.

■■ Defendant's next contention is directed to alleged insufficiency of the evidence to prove guilt beyond a reasonable doubt. The evidence against defendant is mostly circumstantial. The law makes no distinction between direct and circumstantial evidence which have the same legal weight and effect. (*People v. Robinson*, 14 Ill.2d 325, 331, 153 N.E.2d

65.). It has been held many times that circumstantial evidence which produces a reasonable and moral certainty that the accused committed the crime is sufficient to justify a conviction. (*People v. Schulewitz*, 87 Ill.App.2d 331, 337, 231 N.E.2d 678, citing *People v. Garnier*, 20 Ill.App. 2d 492, 156 N.E.2d 613.) The principle is well settled that the guilt of a defendant may be established entirely by circumstantial evidence and it is "* * * necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." *People v. Marino*, 44 Ill.2d 462, 580, 256 N.E.2d 770, citing *People v. Bernette*, 30 Ill.2d 359, 367, 197 N.E.2d 436, and other authorities. Application of these principles to the case at bar leads convincingly to the conclusion that guilt has been proved beyond reasonable doubt.

The evidence shows that only defendant and deceased had keys to the apartment. A number of witnesses testified that there were no signs of forcible entry at the front or rear doors of the apartment. There was no evidence of sexual molestation of the deceased. The fact that the clothing of deceased was disarrayed in such a manner as to expose the area where she customarily kept her money and jewelry would indicate that her assailant acted with knowledge of these facts. These circumstances negate robbery or sexual attack by a stranger.

The empty bottle of cologne and the appearance of the scent on the clothing over the body apparently resulted from an attempt to overcome the stench which emanated from the corpse. This would not commence until after decomposition had set in, therefore, the cologne was, in all probability, sprinkled in the area of the body some time after death. No strange intruder would have revisited the scene of the crime to accomplish this. In addition, Clara Brabec and other persons noted that the draperies had been closed as early as December 20. This contradicted defendant's testimony that he first observed the drapes closed on December 24. A prowler would not have waited to close and fasten the drapes. However, the defendant was seen entering the apartment at various intervals between December 20 and December 28.

Defendant was perennially short of funds as shown by the fact that he often borrowed money from his friend Ann Carlson. Yet, on December 21, he gave her $200 from a large roll of $20 and $50 bills which he had in his pocket. At the same time he gave her three rings. He told her that he had obtained these rings from the vault. The evidence shows that one ring was constantly worn by the mother and the other two rings were kept pinned to her girdle. Since Alice Brooks and Clara Brabec both knew that the two diamond rings and money in an envelope had been

pinned to the underclothing of the deceased, it may well be assumed that her son would have the same knowledge. Both of these women testified that deceased never removed the purple ring from her hand.

On December 24, Mrs. Schmidt left a Christmas present for deceased at the door and two other gifts had already been placed there. None were there on December 27, but Christmas wrappings were found on top of the heap beneath which the body of deceased had been hidden. The packages then must have been brought into the apartment between December 24 and December 27. It is significant that defendant was seen entering the apartment at intervals between these dates.

When Clara Brabec saw defendant in the tavern on December 27, she found costume jewelry of the deceased wrapped up in a handkerchief in his pocket. In his testimony, defendant gave no explanation for this fact. Defendant told Mrs. Brabec and Mr. Schmidt on December 27 that his mother had gone to Arizona. He gave Ann Carlson the same information on December 22. Yet, later, defendant said that he did not know where his mother was. Defendant testified that his mother was fine on December 20 and until December 24, when he allegedly discovered her dead body, but several witnesses tried on numerous occasions to reach the mother in person and on the telephone between those dates without success.

Defendant showed consciousness of guilt by his conduct. He testified that he tried to clean up the blood; that he put the blood stained bathroom rug in the shower and that he tried to wipe up the blood on the floor. The green shirt stained with the mother's blood was his property. It was found in the bedroom which he occupied and where he always changed his clothes. An intruder would hardly have used the shirt to clean the area and certainly would not undertake to return it to defendant's room. When Clara Brabec told defendant that she was going to the police, defendant left Ann Carlson's house that same night with a large sum of money and with all three of the valuable rings in his possession. Defendant tried to conceal the fact of his mother's death from Louis Tazelaar and his daughter. He told Ann Carlson not to speak about it to them. He specifically warned her not to mention anything about his mother in front of the other people in the Tazelaar home. He told Ann Carlson that he would not tell her anything about his mother. When he spoke to Clara Brabec from the bus station, after he knew that the mother's death had become known, he threatened suicide. He fled abruptly from Ann Carlson's home to Berwyn and he did not leave the Tazelaar home at any time until he was arrested.  .

Defendant took the stand and attempted an explanation of this massive circumstantial proof. His story was inherently improbable and unbeliev-

able. His testimony that his mother was alive and well on December 24 is contrary to the scientific opinion of the pathologist who fixed time of death between December 19 and December 22. Defendant's testimony that when he returned in the afternoon he found his mother dead and the drapes then closed and fastened shut with clothespins, is incredible in view of testimony that his mother could not be reached by several people for days prior to December 24. His testimony that when he saw his mother apparently dead he did not attempt to touch her or check her pulse to see if she were possibly alive, and his complete failure to summon medical or police assistance makes his entire testimony highly improbable.

■■ Furthermore, defendant himself freely admitted that he had lied to Ann Carlson, to Clara Brabec and to Mr. Schmidt when he told them that his mother had gone to Arizona. He admitted that he lied to Mrs. Carlson "regularly." He admitted that he had lied to the court and the jury on direct examination when he said that he told Ann Carlson that he obtained the money in his possession from working. His story that he obtained this money from payment of a gambling debt was completely without foundation or corroboration. Unless the defendant's denial of guilt was reasonable, it could be rejected by the jury because of its improbability. See *People v. Moore*, 130 Ill.App.2d 266, 269, 264 N.E.2d 582, 584, citing *People v. Smith*, 107 Ill.App.2d 267, 270; *People v. Bullock*, 123 Ill.App.2d 30, 34.

In addition to this mass of convincing circumstantial evidence, we must add the admissions made by defendant when he told Tazelaar, "I killed her" as corroborated by the testimony of Roberta Tazelaar who thought that defendant said "I think I killed her." We find the verdict of guilty proper and completely supported by the evidence beyond reasonable doubt.

Defendant next contends that the court improperly instructed the jury with reference to circumstantial evidence. At the request of the People, the court gave an instruction defining circumstantial evidence taken verbatim from IPI-Criminal 3.02. The court rejected an instruction tendered by defendant using this same language but adding thereto the following:

"You should not find defendant guilty unless the facts and circumstances proven exclude every reasonable theory of innocence."

■■ The committee note appearing after this instruction states that the second paragraph, being the language added in the instruction tendered by defendant, should be given only when the proof of guilt is entirely circumstantial. The committee's statement is well supported by applicable authority. (See *People v. Otkins*, 114 Ill.App.2d 439, 448, 252

N.E.2d 906. See also, *People v. Beck,* (133 Ill.App.2d), 273 N.E.2d 169.) It is clear that the additional portion of the instruction tendered by defendant is applicable only where there is no direct evidence and the proof of guilt is entirely circumstantial. However, in the case at bar, there was direct evidence of the guilt of defendant consisting of the admissions allegedly made by him in accordance with the testimony of two witnesses. An admission is a type of confession. A voluntary confession "\* \* \* is of convincing character and the highest type of evidence known to law." (*People v. Green,* 17 Ill.2d 35, 41, 160 N.E.2d 814.) We find no error in the instructions.

Defendant next contends that he was prevented from having a fair trial. During their deliberation, the jurors requested that they return to the courtroom. This was done and, in the presence of the court and both counsel, the foreman asked if the jury could have various pictures which had been admitted into evidence and exhibited to the jury but not taken into the jury room. The trial judge stated that he would not change his original ruling denying this unless counsel would both agree. An agreed amendment to the report of proceedings shows that the judge looked at the Assistant State's Attorney who shrugged his shoulders and looked at the defense attorney. The jury remained in the jury box and the judge and both counsel retired to chambers. After a short time, they returned to the courtroom and the court informed the jury that he would abide by his previous ruling and would not allow these pictures into the jury room.

We find no error or prejudice to the defendant by virtue of this incident. Defendant's brief states that the State's Attorney "shrugged his assent." We cannot find assent from a shrug of the shoulders and do not believe that, even if the jury saw this shrug, they would deduce assent from this. The dictionary definition of the ordinary accepted meaning of a shrug of the shoulders is an expression of indifference or a lack of interest. The fact that the judge told the jurors that he would abide by his previous ruling and not permit them to have the pictures showed definitely that this was done by order of court as a matter of law. No authority is cited by defendant in support of this contention. We find no prejudicial error.

The final contention of defendant goes to an alleged abuse of discretion by the court in receiving in evidence and permitting the jury to see various allegedly inflammatory photographs. These photographs showed the costume jewelry of the deceased wrapped in the handkerchief taken from defendant's pocket by Clara Brabec; the articles piled on the body of deceased when she was first found by the police; the green rug found by the police in the bathtub of the apartment; the green shirt found in

defendant's bedroom; the drapes showing them closed with clothespins and the blood stains on the floor of the living room. In addition there were pieces of cloth used by the microanalyst in determining that these stains were human blood. This evidence was exhibited to the jury but the court refused to allow it or any part of it to be taken into the jury room.

■■■ All of these exhibits were demonstrative evidence. All of them had some connection with the crime or its commission and, therefore, all had some probative value. As a general matter, the admission of demonstrative evidence rests in the sound discretion of the trial court. (*People v. Lawrence*, 126 Ill.App.2d 202, 261 N.E.2d 459.) In *People v. Speck*, 41 Ill.2d 177, 242 N.E.2d 208, a number of gruesome photographs were received in evidence despite offer of the defendant to stipulate to much of the information which would appear therefrom. The Supreme Court held that the admission of these photographs was discretionary and that no abuse of that discretion was shown. Similarly, in the case at bar, we hold that admission of the photographs was a matter within the discretion of the trial judge and we find no prejudicial error.

Our review of the entire record and our consideration of all points raised in the briefs convinces us that defendant had a fair trial before an able and conscientious judge and that the judgment and sentence should be affirmed.

Judgment affirmed.

BURKE and LYONS, JJ., concur.